IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MANAGEMENT SCIENCE
ASSOCIATES, INC.,

                    Plaintiff,

          v.                              Civil Action No. 20-0502-CFC

DATAVANT, INC. and
UNIVERSAL PATIENT KEY, INC.,

                    Defendant.

---

Neal C. Belgam, Eve H. Ormerod, SMITH, KATZENSTEIN, & JENKINS LLP, Wilmington, Delaware; James J. Bosco, Jr., Christian D. Ehret, THE WEBB LAW FIRM, Pittsburgh, Pennsylvania; Michael P. Flynn, DICKIE, MCCAMEY & CHILCOTE, P.C., Pittsburgh, Pennsylvania

> *Counsel for Plaintiff*

Jack B. Blumenfeld, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Andrew S. Ong, GOODWIN PROCTER LLP, Redwood City, California; Brett M. Schuman, GOODWIN PROCTER LLP, San Francisco, California; Christie Larochelle, GOODWIN PROCTER LLP, Boston, Massachusetts

> *Counsel for Defendant*

## **MEMORANDUM OPINION**

December 30, 2020
Wilmington, Delaware

_____

COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

Plaintiff Management Science Associates, Inc. (MSA) has sued Defendants

Datavant, Inc. and Universal Patient Key, Inc. (UPK) for infringement of U.S.

Patent No. 9,614,814 (the #814 patent). D.I. 1. Pending before me is Defendants'

motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). D.I. 10.

Defendants argue I should dismiss MSA's complaint because the asserted patent is

invalid under 35 U.S.C. § 101 for failing to claim patentable subject matter.

## I.    Background

MSA is a provider of de-identification technology for removing personally

identifiable information from data. D.I. ¶ 17. Datavant and UPK are healthcare

data management companies. D.I. 1 ¶¶ 21–22. MSA has alleged that Defendants

sell de-identification software that infringes the #814 patent. D.I. 1 ¶¶ 40–45.

The asserted patent is titled "System and Method for Cascading Token

Generation and Data De-identification." It claims systems and methods for de-

identifying client records. The patent describes approaches for creating unique

tokens that can be substituted for personally identifying information. The parties

agree the claim element that separates the #814 patent from the prior art is the use

of a "client tag," a unique identifier for each client, as one of the inputs in the

creation of a token. D.I. 1 at ¶ 38; D.I. 15 at 1, 9; D.I. 16 at 1; *see also* D.I. 11-1,

Ex. C at 7–8 (allowing application based on the "client tag" element).  The "client

tag" may be as simple as the client's name.  #814 patent at 6:41–43.  A "client tag"

identifies the client who provided the record, enabling records from different

clients to be distinguished even if those records are otherwise the same, as could

occur, for example, if different clients provided records about the same patient.

#814 patent at 6:34–37.

The #814 patent's written description explains how de-identified tokens can

be created.  Much of this information is more pertinent to related U.S. Patent No.

9,292,707, which shares the same written description as the #814 patent, but it still

provides context for the #814 claims.  The written description explains that "[f]or

decades, data including personally-identified information has been de-identified

through the creation of tokens that uniquely identify an individual."  #814 patent at

1:21–23.  One method of creating a token is hashing, where a mathematical

function is used to convert arbitrary data (such as a password or personally

identifying information) into data of a particular size.  The hashing function is

unidirectional, meaning that the original data cannot be recovered from the output,

even if the hashing function is known.  The #814 patent describes how a unique

de-identified token can be created from multiple data elements (e.g. name, date of

birth, and zip code of a patient in a database rather than name alone), and that a

unique "client tag" identifying the client may be among the data elements.  #814

2

patent at 4:5–10, 6:41–43.  One embodiment of the invention describes using a hash function to create an intermediary token before combining that intermediary token with another data element and applying a second hash function to generate a final token.  #814 patent at 1:49–65.  This process can be repeated multiple times.

The #814 patent has three independent claims.  Claim 1 describes a "computer implemented method for de-identifying records," claim 10 describes a "computer program product for de-identifying records," and claim 19 describes a "system for de-identifying records."  #814 patent at claim 1 (9:63–64), claim 10 (10:60–61), claim 19 (12:14).  The remaining seventeen claims in the #814 patent are dependent claims.

The Complaint alleges Defendants infringe "at least claims 1, 10, and 19" (the independent claims).  D.I. 1. ¶ 49.  Defendants argue that claim 1 is representative.  D.I. 11 at 5.  Claim 1 recites:

> [a] computer-implemented method for de-identifying records received from a plurality of clients, each of the plurality of clients associated with a client tag unique to the client and a plurality of records including identifying data for a plurality of individuals, comprising:
>
> receiving a record for an individual from at least one data storage device associated with a client, the record comprising a plurality of data elements identifying the individual;
>
> generating, with at least one processor, a token based at least partially on the plurality of data elements and a client tag uniquely identifying the client among the plurality of clients;

3

creating, with at least one processor, a de-identified record comprising a portion of the record and the token;

matching, with at least one processor, the token or a new token based on the token to at least one other token in a database, the at least one other token generated based on the client tag and associated with at least one other de-identified record for the individual; and

linking, with at least one processor, the de-identified record to the at least one other de-identified record in at least one data storage device.

Claim 10 recites:

[a] computer program product for de-identifying records received from a plurality of clients, each of the plurality of clients associated with a client tag unique to the client and a plurality of records including identifying data for a plurality of individuals, comprising at least one non-transitory computer-readable medium comprising program instructions that, when executed by at least one processor, cause the at least one processor to:

receive a record for an individual from at least one data storage device associated with a client, the record comprising a plurality of data elements identifying an individual;

generate a token based at least partially on the plurality of data elements and a client tag uniquely identifying the client among the plurality of clients;

create a de-identified record comprising a portion of the record and the token;

match the token or a new token based on the token to at least one other token in a database, the at least one other token generated based on the client tag and associated with at least one other de-identified record for the individual; and

link the de-identified record to the at least one other de-identified record in at least one data storage device.

4

Claim 19 recites:

> [a] system for de-identifying records received from a plurality of clients, each of the plurality of clients associated with a client tag unique to the client and a plurality of records including identifying data for a plurality of individuals, comprising:
>
> (a) a data supplier computer comprising at least one processor and a de-identification engine, the de-identification engine configured to:
>
>> (i) receive a record for an individual from at least one data storage device associated with a client, the record comprising a plurality of data elements identifying an individual; and
>>
>> (ii) generate a token based at least partially on the plurality of data elements and a client tag uniquely identifying the client; and
>
> (b) a data processing entity computer remote from the data supplier computer, the data processing computer comprising at least one processor configured to:
>
>> (i) match the token or a new token based on the token to at least one other token in a database, the at least one other token generated based on the client tag and associated with at least one other de-identified record for the individual; and
>>
>> (ii) link a de-identified record comprising a portion of the record and the token to the at least one other de-identified record in at least one data storage device.

In short, the claims cover systems and methods in which (1) a data record is received, (2) a token is generated based on a client token and other data elements, (3) a de-identified record is created with the token as the record's label (this step is omitted from claim 19), (4) the record is matched to an existing record using the token, and (5) the two records are linked. The dependent claims describe particular

5

implementation choices, *see, e.g.*, #814 patent at claim 2 (requiring the token to be created through hashing), or the inclusion of additional abstract steps, *see, e.g.* #814 patent at claim 4 (requiring the creation of an intermediate token which is then used as the input to create a final token).

## II.    Legal Standards

### A.    Legal Standards for Stating a Claim

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but the complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must set forth enough facts, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Deciding whether a claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

When assessing the merits of a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and in documents explicitly relied upon in the complaint, and it must view those facts in the light most favorable to the plaintiff. *See Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks omitted).

## B.    Legal Standards for Patent-Eligible Subject Matter

Section 101 of the Patent Act defines patent-eligible subject matter. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.

There are three judicially-created limitations on the literal words of § 101. The Supreme Court has long held that laws of nature, natural phenomena, and abstract ideas are not patentable subject matter. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). These exceptions to patentable subject matter arise from the concern that the monopolization of "these basic tools of scientific and technological work" "might tend to impede innovation more than it would tend to promote it." *Id.* (internal quotation marks and citations omitted). Abstract ideas

7

include mathematical formulas and calculations. *Gottschalk v. Benson*, 409 U.S. 63, 71–72 (1972).

"[A]n invention is not rendered ineligible for patent [protection] simply because it involves an abstract concept[.]" *Id.* at 217. "[A]pplication[s] of such concepts to a new and useful end . . . remain eligible for patent protection." *Id.* (internal quotation marks and citations omitted). But in order "to transform an unpatentable law of nature [or abstract idea] into a patent-eligible application of such law [or abstract idea], one must do more than simply state the law of nature [or abstract idea] while adding the words 'apply it.'" *Mayo Collaborative Servs. v. Prometheus Laby's, Inc.*, 566 U.S. 66, 71 (2012) (emphasis omitted).

In *Alice*, the Supreme Court established a two-step framework by which courts are to distinguish patents that claim eligible subject matter under § 101 from patents that do not claim eligible subject matter under § 101. The court must first determine whether the patent's claims are drawn to a patent-ineligible concept— i.e., are the claims directed to a law of nature, natural phenomenon, or abstract idea? *Alice*, 573 U.S. at 217. If the answer to this question is no, then the patent is not invalid for teaching ineligible subject matter. If the answer to this question is yes, then the court must proceed to step two, where it considers "the elements of each claim both individually and as an ordered combination" to determine if there is an "inventive concept—*i.e.*, an element or combination of elements that is

8

sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217–18 (alteration in original) (internal quotations and citations omitted).

Issued patents are presumed to be valid, but this presumption is rebuttable. *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 96 (2011). The Patent Office's decision on patent eligibility is not binding on this court. *See WhitServe LLC v. Dropbox, Inc.*, No. CV 18-665-CFC, 2019 WL 3342949, at *7 (D. Del. July 25, 2019); *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379, 1385 (Fed. Cir. 2012) ("courts have the final say on unpatentability of claims, not the [Patent Office].").

Subject-matter eligibility is a matter of law, but underlying facts must be shown by clear and convincing evidence. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

## III.   DISCUSSION

Applying the two-step framework from *Alice*, I find that the #814 patent is invalid under § 101. The #814 patent's claims are directed to the abstract idea of collecting, labeling, and manipulating data and do not contain any inventive concept.

### A.   Claim 1 Is Representative

I find that the claims of the #814 patent can be considered together for the purposes of § 101 and that claim 1 is representative for this analysis. When the

only difference between claims is the form in which they are drafted, it is appropriate to treat them as "as equivalent for purposes of patent eligibility under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1277 (Fed. Cir. 2012). Here, the three independent claims all describe the same invention but change the form of the claim language. Claim 10 simply rephrases claim 1 as a "computer program product" rather than as a "computer-implemented method." #814 patent at claim 1 (9:63), claim 10 (10:60). And claim 19 rephrases the same process in the form of a system. #814 patent claim at 19 (12:14). Each claim describes the same steps of "receiving a record," "generating" a token, "creating" a de-identified record, "matching" the token to another token, and "linking" the de-identified record to another such record. #814 patent at claim 1, claim 10, claim 19. Claim 19 leaves out the "creating" step, but this omission does not affect the subject-matter eligibility of the claim.

Although it is not clear whether MSA has asserted the patent's dependent claims, Defendants have challenged them and I find that the dependent claims do not add limitations that affect their subject-matter eligibility. Claims 2, 3, 11 and 12 require hashing the client tag. *Cf. Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1375 n.9 (Fed. Cir. 2017) (explaining that a hash identifier is a "generic and routine concept"). Claims 4 and 13 require creating an intermediate token, which is then used to create a final token. Claims 5 and 14 describe

10

combining the client tag with other data elements to create the token. Claims 6, 7, 15, and 16 describe choices for the client tag. Claims 8 and 17 add the mathematical step of calculating a checksum. Claims 9 and 18 split the described data pipeline across two computers. Claim 20 simply requires that the computers in the system are configured to create records as is the case for all claims except claim 19. None of these limitations removes the claims from the realm of the abstract or adds any additional inventive steps beyond well-understood, routine, or conventional computer functionality.

MSA identifies claim 19 as having a distinct scope from claim 1 and argues that it must be considered separately. D.I. 15 at 17. MSA emphasizes that claim 19 requires the data processing entity computer and the data supplier computer to be "remote" from each other. D.I. 15 at 18. But this limitation does not affect the § 101 analysis. This claim takes the same idea as the other claims (albeit without the "creating" step) and limits it to a particular, but routine, computer arrangement. A claim directed to an abstract idea does not become patent eligible simply because the claim only covers that idea's use or application in a narrow technological context. *See buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (explaining that narrowing the use of an abstract idea *"to a particular technological environment"* does not make a claim directed to an otherwise abstract idea patent eligible).

MSA's reliance on *BASCOM Global Internet Services Inc. v. AT&T Mobility LLC* is misplaced.  827 F.3d 1341 (Fed. Cir. 2016).  In *BASCOM* the patent had an inventive concept because it took advantage of the technical configuration of network technology to allow improved, individualized filtering of internet content.  827 F.3d at 1349.  In that case, the arrangement of separating the filtering tool and the end user's computer provided technical performance improvements.  *Id.* at 1344–45.  The Federal Circuit found that BASCOM's invention went "beyond simply using generic computer concepts in a conventional way." *Id.* at 1352.  The *BASCOM* court agreed that each individual claim element was routine and well-understood in the art but found that the combination of elements was inventive.  *Id.* at 1359.  The Federal Circuit explained that the arrangement of elements as a whole reflected a technical invention which was inseparably linked to the properties of computer networks.  *Id.* at 1350.  The Federal Circuit noted that the invention "would not contain an inventive concept" if it merely covered the abstract idea of filtering content along with "the requirement to perform it on the Internet, or to perform it on a set of generic computer components." *Id.*

The limitation that the two computers must be "remote" in claim 19 is analogous to the generic requirement that an idea be performed on the internet.  And the *BASCOM* court explained that such a requirement does not amount to an

inventive concept. *Id.* Having two remote computers does not go "beyond simply using generic computer concepts in a conventional way." *Id.* at 1352. Nor is there an inventive concept when the claim elements are considered as an ordered combination. The arrangement of limitations does not provide any new technical solution. MSA asserts that separating the two computers in claim 19 of the #814 patent has the benefit of allowing the "actual value being used as the client tag [to] not be discernable to the data supplier." D.I. 15 at 18. But neither MSA nor the #814 patent itself articulate why this benefit is a technical solution to a technical problem, rather than merely an incidental benefit of generic computer networks.

In sum, because it does not contain any unconventional limitations, claim 19 does not need to be treated separately from claim 1 for the purposes of § 101. *See Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (explaining substantially similar claims directed to the same abstract idea can be considered together for subject matter eligibility).

### B.    It Is Appropriate to Resolve This Case on a Motion to Dismiss

If there are any claim construction disputes, "the court must proceed by adopting the non-moving party's constructions or the court must resolve the disputes to whatever extent is needed to conduct the § 101 analysis." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) (internal citations removed). The Federal Circuit has "repeatedly affirmed

13

§ 101 rejections at the motion to dismiss stage, before claim construction or
significant discovery has commenced." *Cleveland Clinic Found. v. True Health
Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017); *see also SAP Am., Inc.*,
898 F.3d at 1166 (citing cases); *Epic IP LLC v. Backblaze, Inc.*, 351 F. Supp. 3d
733, 751–52 (D. Del. 2018) (Bryson, J.) (discussing when it is appropriate to
resolve a § 101 motion on the pleadings).

MSA argues that Defendants' motion is premature, because Defendants
implicitly rely on a claim construction argument. MSA suggests there may be
disagreement about the meaning of "client tag." D.I. 15 at 20. But MSA has not
provided an alternative reading for "client tag" or articulated any other
disagreement between the parties on the meaning of the #814 patent claims.
Accordingly, I find that there is no claim construction dispute and that
consideration of the #814 patent's subject-matter eligibility is not premature.

## C. *Alice* Step One — Whether the Claims Are Drawn to Patent-Ineligible Subject Matter

I begin by determining whether the claims at issue are directed to a patent-
ineligible concept. *Alice*, 573 U.S. at 217. "[C]laims are considered in their
entirety [at step one] to ascertain whether their character as a whole is directed to
excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d
1343, 1346 (Fed. Cir. 2015).

14

"The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016) (citation omitted).  The Court has recognized, however, that fundamental economic practices, methods of organizing human activity, and mathematical formulae are abstract ideas. *See Bilski v. Kappos*, 561 U.S. 593, 611 (2010) ("fundamental economic practice" of hedging is unpatentable abstract idea); *Alice*, 573 U.S. at 220–21 ("organizing human activity" of intermediated settlement falls "squarely within realm of 'abstract ideas'"); *Gottschalk v. Benson*, 409 U.S. 63, 68, 71–72 (1972) (mathematical algorithm to convert binary-coded decimal numerals into pure binary code is unpatentable abstract idea); *Parker v. Flook*, 437 U.S. 584, 594–95 (1978) (mathematical formula for computing "alarm limits" in a catalytic conversion process is unpatentable abstract idea).

To determine whether claims are directed to an abstract idea courts generally "compare the claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334.  The Federal Circuit has also instructed district courts to consider as part of *Alice*'s step one whether the claims "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely

15

invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (citing *Enfish*, 822 F.3d at 1336).

Applying these standards, I find that the #814 patent is directed to the abstract idea of collecting, labelling, and manipulating data. *See* D.I. 15 at 12 (characterizing the claims as directed at "generating a unique token based on a client tag and a plurality of elements, where the client tag uniquely identifies a client"). The written description explains that the "client tag" is simply a unique client label, which may be as simple as the client's name. #814 patent at 6:42–43. Besides labelling with a client tag, the patent merely describes routine data collection and manipulation.

Although the systems and methods claimed in the #814 patent require the use of generic computers, the claims are directed to a series of steps that can be performed in the human mind or with pen and paper. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) ("Such a method that can be performed by human thought alone is merely an abstract idea and is not patent-eligible under § 101"). There is "no particular concrete or tangible form" to the claimed invention. *Ultramercial v. Hulu*, 772 F.3d 709, 715 (Fed. Cir. 2014). Therefore, the claims are directed to an abstract idea.

*Electric Power Group, LLC. v. Alston, S.A.* supports this conclusion. 830 F.3d 1350, 1354 (Fed. Cir. 2016). In that case, the Federal Circuit explained as

part of the *Alice* step one analysis that "information as such is an intangible" and that therefore claims directed to "collecting information, including when limited to a particular content" are drawn to abstract ideas. *Id.* at 1354 (citing cases). In the court's words, the analysis of information "by steps people go through in their minds, or by mathematical algorithms, without more" are "mental processes within the abstract-idea category." *Id.* (citing cases). And the output of these "abstract processes of collecting and analyzing information, without more . . . is abstract as an ancillary part of such collection and analysis." *Id.* Here the claims are directed to precisely this kind of abstract process.

MSA relies on *Enfish*, but the claims at issue in that case were patentable because they were not drawn to an abstract process that could be implemented on computers but rather to a database technique that improved the technical capabilities of computers. *Id.* at 1336–37. In contrast, the use of a unique client identifier does not improve the functioning of computers themselves.[1]

The #814 patent's written description explains why it may be useful to have a unique identifier for a client. #814 patent at 6:22–45. But the described benefits

---

[1] MSA also relies on *Thales Visionix Inc. v. U.S.*, but that case presents very different facts than are at issue here. In *Thales Visionix*, the invention involved not just the manipulation of data, but also an unconventional arrangement of physical inertial sensors. 850 F.3d 1343, 1348 (Fed. Cir. 2017). The #814 patent claims involve no physical components other than generic computers.

do not transform "client tags" into a technical solution to a technical problem. The idea of using a unique label for each client does not improve the technical capabilities of computers. This is apparent from the fact that "client tags" could be applied in any record keeping system such as a library card catalogue, an office filing system, or an analogue medical records database.

MSA argues that the claims of the #814 patent are directed "to non-abstract, technical solutions to technical problems in the field of token generation and data de-identification that achieve a significant improvements in the operation and performance of data de-identification processes, token creation processes, record matching processes, and record linking processes." D.I. 15 at 5. But MSA supports this assertion only with conclusory allegations in the complaint, D.I. 1 at ¶¶ 27–38, which I am to ignore, *Bell Atl. Corp.*, 550 U.S. at 555.

The Federal Circuit's case law makes clear that claims directed to forms of data collection and manipulation must offer technical improvements to computer technology in order to not be directed to an abstract idea. *Compare Smart Sys.*, 873 F.3d at 1372 ("We have determined that claims directed to the collection, storage, and recognition of data are directed to an abstract idea.") *with Enfish*, 822 F.3d at 1336 (finding claims subject-matter eligible when directed to the "improvement to computer functionality itself"). For example, in *SAP America*, the Federal Circuit found that a patent which claimed the use of resampling statistical

18

techniques for analyzing financial data was directed to an abstract idea even

though it described an improved mathematical analysis and was implemented on

computers, because the improved analysis was not directed to computer

technology.  898 F.3d at 1168.  Similarly, the #814 patent claims cover an

algorithmic process without describing any improvement to computer operations.

Simply requiring the use of a label does not add a technical improvement.  The

#814 patent claims are directed to an abstract idea, because the claimed invention

can be conducted in the human mind and lacks any particular tangible form.

### D.    Inventive Concept

Having found that the claims are directed to an abstract idea, I must

determine whether the claims contain an "'inventive concept' sufficient to

'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573

U.S. at 221 (quoting *Mayo*, 566 U.S. at 77).  It is insufficient for the patent to

"simply state the law of nature while adding the words 'apply it.'" *Mayo*, 566 U.S.

at 72.  A claim directed towards an abstract idea must include "'additional

features' to ensure 'that the [claim] is more than a drafting effort designed to

monopolize the [abstract idea].'" *Alice*, 573 U.S. at 221 (alterations in original)

(quoting *Mayo*, 566 U.S. at 77).  No such additional features exist here, and I find

that, whether considered individually or as an ordered combination, the claim

elements of the #814 patent do not "transform" the claimed abstract idea into patent-eligible subject matter.

The patent's claims simply take the abstract idea of using a client tag in the collection, labeling, and manipulation of data and apply that idea with generic computers made up of data storage devices, computer processors, and computer-readable media containing program instructions. #814 patent at claims 1, 10, 19; *see also* #814 patent at 4:15–29, 35–43 (explaining that the invention can be performed on generic computers that communicate over ordinary networks). The patent does not require any particular procedure for accomplishing these steps. #814 patent at 6:8–13 (anticipating that any algorithm could be used to generate tokens). The invocation of generic computer technology does not provide an inventive concept. *See Alice*, 573 U.S. at 222; *SAP Am.*, 898 F.3d at 1170 (carrying out improved mathematical operations on a generic computer is not inventive); *Elec. Power*, 830 F.3d at 1355 (holding the claims at issue did not contain an inventive step because they did "not require any nonconventional computer, network, or display components"); *Ultramercial*, 772 F.3d at 717 ("adding a computer to otherwise conventional steps does not make an invention patent-eligible"); *buySAFE*, 765 F.3d at 1355 (finding the claims' generic invocation of computer functionality was not "even arguably inventive").

MSA argues that the claims, when considered as an ordered combination, describe an invention that is neither routine nor conventional.  D.I. 15 at 16 (citing *DDR Holdings, LLC v. Hotels.com, L.P*, 773 F.3d 1245, 1259 (Fed. Cir. 2014)). But MSA identifies the use of a "client tag" as what renders the invention unconventional, D.I. 15 at 14–15, even though that use of a "client tag" is part of the abstract idea to which the claims are directed.  The inventive feature, however, cannot be supplied by the abstract idea itself.  *See Mayo*, 566 U.S. at 72–73 (explaining the inventive concept must be "significantly more" than the abstract idea itself); *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept").  Nor is there any other inventive feature present in the claims when considered as a whole.  In short, the #814 patent lacks any additional features or inventive concepts that would make the claims eligible under § 101.

## IV.   CONCLUSION

For the reasons stated above, I find that all claims of the #814 patent are invalid under § 101 for lack of subject-matter eligibility.  Accordingly, I will grant Defendants' Motion to Dismiss the Complaint for Failure to State a Claim (D.I. 10).

The Court will issue an Order consistent with this Memorandum Opinion.